## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

GRACE GILMORE, on behalf of
herself and all others similarly situated,

Plaintiff,

v.

GENERAL MOTORS LLC, ONSTAR
LLC, LEXISNEXIS RISK
SOLUTIONS, INC., and VERISK
ANALYTICS, INC.,

Defendants.

Civil Action No. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

Plaintiff Grace Gilmore ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against General Motors LLC ("GM"), OnStar LLC ("OnStar"), Verisk Analytics, Inc. ("Verisk"), and LexisNexis Risk Solutions, Inc. ("LexisNexis", collectively, "Defendants") and alleges, upon personal knowledge as to her own actions and the investigation of counsel, and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.     Plaintiff brings this action on behalf of a class of all persons who purchased or leased a vehicle from General Motors and had their personal driving

behavior information (the "Driver Behavior Data") transmitted without their knowing consent to unauthorized third parties, including LexisNexis, Verisk and various insurance carriers.

2.     Vehicles have become the new smartphones on wheels.  They are now equipped with modules that have the ability and are capable of collecting and transmitting the personal, private driving information of their users; to wit, their driving behavior, and even the behavior of their passengers, to unauthorized third parties. Third parties can then use this information for their own personal financial gain and advantage.

3.     Some vehicle purchasers may knowingly consent to having their personal driving habits and behavior monitored and transmitted to third parties such as their insurance carriers, by agreeing to specific safe driving programs offered by either their insurance carriers or entities related to their vehicle manufacturer and to installing dongles in their vehicles. Those programs promise the driver's insurance premiums will be reduced if his/her driving habits and behavior, measured by such indicia as speeding, hard braking, and the number of stops, comport with the company's safe driving policies.

4.     The Class Members (defined below) in this instance, however, did not knowingly consent to have their Driver Behavior Data transmitted to any unauthorized third parties, much less their insurance carriers, and in many cases took

specific measures to terminate any safe driving programs once they did learn that they were enrolled in them without their consent.

5.      Nonetheless, Class Members' personal, private Driver Behavior Data was collected by GM, through various modules located in their vehicles and associated connectivity apps related to its affiliated company OnStar, regardless of whether the users consented to such transmission.

6.      OnStar, in turn, transmitted this private Driver Behavior Data to, among others, LexisNexis and Verisk, both of which are consumer reporting agencies, that used the information to create a risk score, that was then transmitted to various insurance companies without the driver's knowledge or consent.

7.      For the most part, drivers who were subjected to this unauthorized intrusion into their private data experienced a concomitant increase in their insurance premiums presumably based upon this private Driver Behavior Data.

8.      This practice further potentially exposed drivers of GM vehicles to unwitting surveillance and disclosure of their personal and individual driving habits. Among the metrics recorded are average speed, frequency and intensity of acceleration and braking, percentage of time that the speed exceeds 80 miles per hour ("MPH"), and late-night driving habits. The Driver Behavior Data is  collected at the conclusion of each drive.

9.      This Driver Behavior Data was taken out of context and because it was

surreptitiously collected, precluded drivers from providing any reasonable explanation as to the various driving patterns depicted in this data, such as sudden stops. Nonetheless, drivers were damaged when this out of context and misleading Driver Behavior Data was provided to their respective insurance carriers by LexisNexis and/or Verisk, resulting in their paying increased premiums or preventing them from obtaining vehicle insurance at reasonable premiums elsewhere.

10.     Even for those that actively opted into The OnStar Smart Driver Plan ("Smart Driver"), the software is marketed as a means of personalizing and enhancing "the driving experience" via improvements to safety, entertainment, navigation, and control of the vehicle in which the software is installed or linked. The software is not advertised as a means of invasively collecting consumer data for sale to third parties. As alleged below, there is nothing in any of the relevant privacy policies that would allow for the dissemination of this data to a driver's insurance company.

11.     Plaintiff brings this action against General Motors and its affiliate, OnStar, for unfair trade practices, breach of contract, invasion of privacy and unjust enrichment.

12.     Plaintiff further brings this action against LexisNexis and Verisk for violations of the Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681 *et seq*.

## JURISDICTION AND VENUE

13.    This Court has federal question jurisdiction because this case arises out of violation of federal law. 15 U.S.C. §1681 et seq.; 28 U.S.C. §1331. Jurisdiction arises for Plaintiff's supplemental state claims under 28 U.S.C. §1367.

14.    The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendants, there are more than 100 Members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

15.    Venue is proper because the principal place of business of Defendant LexisNexis is in this District. In addition, a substantial part of the events and/or omissions giving rise to the underlying action occurred in this District.

## PARTIES

16.    Plaintiff Grace Gilmore is a citizen of Mississippi.  She purchased a 2020 Chevrolet Spark on December 11, 2019. Plaintiff Gilmore explicitly asked not to be enrolled in OnStar, due to the extra cost. She did not learn until more than four (4) years later that she had been enrolled in OnStar anyway, without her knowledge or consent, as the cost of the OnStar services was not itemized in her sales agreement. After she solicited The Hartford for an insurance quote in April of 2024 that was $30 dollars per month higher than her current rate, The Hartford informed her that the

higher rate was imposed because of the information contained in a consumer report from LexisNexis. Plaintiff Gilmore then requested her consumer report from LexisNexis. The report contained 357 records of Driver Behavior Data, referred to as "[t]elematics" (as explained below). However, much of the information was incorrect, including incorrect date of birth, address, email address, and driver's license information. Moreover, the Driver Behavior Data was misleading because it lacked context. For example, the Smart Driver records reveal instances of hard braking by Plaintiff Gilmore, but do not explain that the hard braking in each instance was necessary to avoid a potential collision.

17.     Defendant General Motors is a Delaware corporation headquartered in Detroit, Michigan.

18.     Defendant OnStar LLC is a Delaware corporation headquartered in Detroit, Michigan. Both GM and OnStar are wholly owned by General Motors Holdings LLC.

19.     Defendant LexisNexis Risk Solutions, Inc. is a Delaware corporation headquartered in Alpharetta, Georgia.  Among other things, it is a consumer reporting agency that in this instance is governed by the FCRA.

20.     Defendant Verisk is a Delaware corporation headquartered in Jersey City, New Jersey. Among other things, it is a consumer reporting agency that is governed by the FCRA.

21.    Further, LexisNexis and Verisk specifically provide the auto industry and insurance companies with Driver Behavior Data, advertising to clients that it can provide them with a seamless delivery of driving records to enable them to improve quotes and underwriting, i.e. increase insurance premiums.

## BACKGROUND

***GM Violates the Agreed to Principles Governing the Collection of Consumer Data***

22.    Since at least 2015, GM has been equipping its vehicles with computer modules, and sensors which enable the vehicle to collect information about the driver and the vehicle's occupants.  These computer modules are able to stream information about the driver and the operation of the vehicle directly to the GM.

23.    The information that GM vehicles collect fall into three main categories: data generated in a vehicle but not transmitted outside the vehicle, such as the computer systems within a vehicle that run different functions of the vehicle; data transmitted outside the vehicle which occur with certain subscription services and applications, such as crash notifications and certain diagnostics; and data transmitted in and out of the vehicle, such as navigation systems. https://www.autosinnovate.org/privacy (Last accessed May 8, 2024)

24.    With the increase in vehicle connectivity and automation, and the sophistication of sensors and other computer modules in their vehicles, in 2014, the major automobile companies, including GM, agreed to adopt a set of principles

governing their collection and accumulation of the trove of private information that they collected and used, and to which they had access.

25.    To that end, the Alliance of Automobile Manufacturers (the "Alliance"),[1] which includes GM, adopted a set of principles governing the collection, use and dissemination of private driver information (the "Principles").

26.    The Principles articulated in a report entitled "Consumer Privacy Protection Principles: Privacy Principles for Vehicle Technologies and Services" issued on November 12, 2014 (and reviewed in 2018 and 2022) set forth the defining standards for the automotive industry's collection and use of private driver information in recognition of the importance of privacy to consumers.

27.    In the Principles, GM and other manufacturers acknowledged personal driving behavior as one of the categories of Covered Information;[2] that is, data whose handling and dissemination required especially stringent guiderails, precautions, and consents.

28.    The Principles also acknowledge the need to present the context in

---

[1] On January 1, 2020, the Alliance merged with the Association of Global Automakers, Inc. to become The Alliance for Automotive Innovation, Inc. GM remained a member of the merged entity.

[2] Covered Information includes identifiable information that vehicles collect, generate, record or store, which is retrieved by the automaker, as well as personal subscription information including geolocation information, biometrics, and driver behavior information.

which Covered Information such as driving behavior, was presented and shared, and that impact that disclosing it would have on the consumer.

29.     The Principles include the following:

(1)     Transparency: Requiring automobile manufacturers to provide owners and users with ready access to clear and meaningful notices about the manufacturer's collection, use and sharing of Covered Information;

(2)     Choice: Providing owners and users with certain choices regarding the collection, use and sharing of their Covered Information;

(3)     Respect for Context: Requiring members to commit to using and sharing the Covered Information in ways that are consistent with the context in which the information was collected, taking into account the likely impact on owners and users;

(4)     Data Minimization, De-Identification and Retention: Committing members to collect Covered Information only as needed for legitimate business purposes, and not retaining data that is no longer necessary;

(5)     Data Security: Requiring members to implement reasonable measures to protect Covered Information against loss and unauthorized use;

(6)     Integrity and Access: Requiring members to implement reasonable measures to maintain the accuracy of the Covered Information and to provide users and owners with reasonable means to review and correct

personal subscription information; and

(7)    Accountability: Requiring members to commit to taking reasonable steps to ensure that they and other entities that receive Covered Information adhere to the Principles.

30.    GM's surreptitious taking and transmission of the Driver Behavior Data of GM drivers for eventual transmission to their insurance carriers, through LexisNexis, a consumer reporting agency, without drivers' knowledge, consent or ability to review and correct such data, violates every one of these Principles.

### *OnStar and the OnStar Program*

31.    OnStar was founded in 1996 and produces driver assistance software for GM vehicles, including Chevrolets, Buicks, Cadillacs, and GMCs.

32.    OnStar provides subscription-based communications in vehicle security, emergency services, turn by turn navigation and remote diagnostics. The current generation of OnStar software is compatible with GM vehicles beginning with the model year 2015.

33.    The OnStar software installed in the vehicles is capable of recording and transmitting Driver Data via GPS (for purposes of navigation, reporting emergencies, etc.) and OBD-II ("On-Board Diagnostics"). When this software is linked with vehicle-specific OnStar applications such as MyChevrolet, MyBuick, and MyCadillac (the "Vehicle-Specific Applications"), these applications receive

Driver Behavior Data recorded by the onboard software and can become an additional means of transmission.

34.     The Vehicle-Specific Applications sync to the vehicle after the users download the applications and log into their OnStar accounts. Using these applications, the drivers can, among other things, give remote commands to their vehicles, locate where they parked the vehicle, and check charging progress. While the applications can be used to turn off the vehicles' Smart Driver interface, they cannot completely shut down the OnStar software's processes for recording and transmitting Driver Data.

35.     OnStar offers a number of programs, including the "Connected Access" plan which provides vehicle diagnostics, the Smart Driver Program, and dealer service scheduling.

36.     In June of 2022, GM began including three-year pre-paid OnStar services as standard mandatory options in Buicks, Cadillacs, and GMCs for $1,500, which was included as part of the price of the MSRP so that drivers did not have a choice as to whether to agree to having OnStar in their vehicles.

37.     OnStar also offers the OnStar Guardian App, which provides safety services on the user's phone or smart speakers and is not specifically keyed to a vehicle. For instance, if a user is a passenger in a different vehicle Guardian can still provide tracking and services like reporting a crash, etc. as long as the application is

turned on and the user is logged into it.

### *Defendant LexisNexis*

38.   LexisNexis is a consumer reporting agency that describes itself as an "analytics provider for industries around the globe, including financial services, retail/ecommerce, logistics and telecommunications."

39.   LexisNexis provides services to insurance companies to "help insurers and automakers streamline business processes, control costs and improve customer experiences." Among these services is the ability to provide consolidated third-party data that can be used to set or modify drivers' automobile insurance quotes or premiums. This includes Driver Behavior Data, which LexisNexis refers to as "telematics." LexisNexis calls this service "Telematics on Demand" or "TOD."

40.   As part of its marketing for this service, LexisNexis touts its ability to "provide timely connected car data and mobility risk insights[.]" The company further states that it "receive[s] and manage[s] data from connected vehicles, mobile apps and third-party services[,]" and that this data "improve[s] [insurers'] ability to assess risk and capture otherwise missed premium."

41.   As LexisNexis notes in its marketing materials, insurance companies can use the driver behavior data they purchase to reassess risk and increase the premiums of the drivers' insurance policies or set higher rates on new policies.

42.   The Driving Behavior Data that LexisNexis transmits to insurance

carriers, however, is misleading as it is taken out of context, and without allowing the driver to review or make corrections to the pattern of driving depicted in the Data. LexisNexis fails to allow drivers to explain whether there were legitimate reasons for any particular driving pattern since it is obtained without the driver's consent.

43.    By failing to put this information in context and not providing drivers with the opportunity to review and correct this information, LexisNexis' use of this information and its transfer of this information to driver's insurance carriers, at a minimum, violates FRCA Section 1681(b), which requires that a consumer reporting agency adopt reasonable procedures for meeting the needs of the insurance industry in a manner that is fair and equitable to the consumer with regard to the confidentiality, accuracy, relevancy and proper use of such information.

44.    Nonetheless, through these services, LexisNexis earns a profit on the Driver Behavior Data that it purchases or otherwise receives from GM and OnStar.

### Defendant Verisk

45.    Verisk is a consumer reporting agency that describes itself as an "at the intersection of people, data, and advanced technologies…[w]e deliver immediate and sustained value to our customers and through them, to the individuals and societies they serve.[3]

---

[3] *About Verisk,* https://www.verisk.com/company/about/ (Last accessed May 8, 2024).

46.     Verisk touts that "[a]s a strategic partner to the global insurance industry, our advanced data analytics, software, scientific research, and deep industry knowledge can help you along the path to profitable growth—now and in the future."[4] Among these services is the ability to provide consolidated third-party data that can be used to set or modify drivers' automobile insurance quotes or premiums. This includes the Driver Behavior Data.

47.     As part of its marketing for these services, Verisk hypes its ability via its smartphone telematics that "[t]he jointly developed solution will combine the Driveway smartphone telematics platform for data collection and driver engagement with the Verisk Data Exchange to apply driver scoring and provide a direct connection for consumers to participating insurers."[5]As Verisk notes in its marketing materials, "[t]he Verisk Data Exchange also assigns consumers a driver risk score, generally similar to a credit score, that they can use to demonstrate their responsible driving history and to request that their car insurance premiums be adjusted

---

[4]    *Insurance      Solutions,      Risk      Software      &      Data      Analytics,* https://www.verisk.com/insurance/ (Last accessed May 8, 2024).

[5] *Verisk Insurance Solutions and Driveway Software Announce Strategic Alliance to Offer Smartphone Telematics Solution for Auto Manufacturers in Verisk Data Exchange*       https://www.verisk.com/company/newsroom/verisk-insurance-solutions-and-driveway-software-announce-strategic-alliance--to-offer-smartphone-telematics-solution-for-auto-manufacturers-in-verisk-data-exchange/ (Last accessed May 8, 2024).

accordingly." [6]

48.     The driver risk score that Verisk transmits to insurance carriers, however, is misleading as it is taken out of context, and without allowing the driver to review or make corrections to the pattern of driving depicted in the Data or used to determine the driver's risk score. Verisk fails to allow drivers to explain whether there were legitimate reasons for any particular driving pattern since it is obtained without the driver's consent.

49.     By failing to put this information in context and not providing drivers with the opportunity to review and correct this information, Verisk's use of this information and its transfer of this information to driver's insurance carriers, at a minimum, violates FRCA Section 1681(b), which requires a consumer reporting agency adopt reasonable procedures for meeting the needs of the insurance industry in a manner that is fair and equitable to the consumer with regard to the confidentiality, accuracy, relevancy and proper use of such information.

50.     Nonetheless, through these services, Verisk earns a profit on the Driver Behavior Data that it purchases or otherwise receives from GM and OnStar.

***None of the Relevant Privacy Policies Allows for Transmission of Driver Behavior Data to Insurers***

51.     Drivers attempting to ascertain the terms of use and privacy policies of

---

[6] *Id.*

GM and OnStar are faced with a veritable rat's nest of policy statements which incorporate each other, in some cases without properly identifying the policy they are incorporating or providing a necessary hyperlink. Given the utter lack of clarity in these seemingly interlocking and mislabeled policy statements, no Class Member can be deemed to have consented to having Driving Behavior Data shared with LexisNexis through OnStar much less with insurance carriers. In any event, none of these policy statements disclose GM's process of providing LexisNexis and Verisk with the private Driver Behavior Data or with any third party whose services are unrelated to the operation of their GM vehicle.

52.     Drivers who use myChevrolet, myBuick, my GMC, myCadillac, or mobile apps are first governed by the "User Terms for Application Services" last updated November 14, 2022 (the "Application Services Terms of Use"). The Terms of Use say nothing about the collection of the Driving Behavior Data and incorporates the "User Terms for Connected Vehicle Services" located at onstar.com for additional terms of use, and to the "Privacy Statement for Application Services" found at www.onstar.com/privacy (Last accessed May 8, 2024).

53.     The "Privacy Statement for Application Services" last updated on May 2, 2022, sets forth how information is collected and used, but only vaguely states that GM collects "vehicle-related information" and "driving information", using as an example the location and speed of a vehicle based on GPS. It says nothing about

collecting Driver Behavior Data.  Moreover, it says nothing about sharing such data with third parties for commercial purposes.

54.    The   "User   Terms   for   Connected   Vehicles   Services"   at https://www.onstar.com/legal/user-terms  (Last  accessed  May  8,  2024)  informs drivers in paragraph 26 that "GM collects, uses, and shares information from and about You and your Vehicle" and then refers to the driver to the "GM Privacy Statement" (the "Privacy Statement") to describe what GM does with that information. It then tells drivers without properly informing them of all the relevant circumstances, that they somehow consent to the collection, use, and sharing of information as described in the GM Privacy Statement and in any revisions that might be made to the GM Privacy Statement. There is no discussion of where the GM Privacy Policy is located or a hyperlink to the GM Privacy Statement. It is thus up to the driver to assume that the privacy statement at issue is on the OnStar page located at www.onstar.com/privacy (Last accessed May 8, 2024).

55.    The pages located at www.onstar.com/privacy contain at least three more policies, including the "Privacy Statement for Application Services (myChevrolet, myBuick, myGMC, myCadillac Mobile Apps), the "Privacy Statement of OnStar Guardian" and the "U.S. Connected Services Privacy Statement."

56.    The "Privacy Statement for Application Services" incorporates   the

"OnStar Privacy Statement" purportedly posted at www.onstar.com/privacy which does not contain any document entitled the "OnStar Privacy Statement" making it impossible for a driver to determine what information is being collected and how it is used.

57.    It does contain the "General Motors U.S. Connected Services Privacy Statement" last updated on July 1, 2023 (the "GM Connected Services Privacy Statement"). Assuming the GM Connected Services Privacy Statement is the correct privacy statement and the GM Privacy Policy reference in some of the documents, the GM Privacy Policy *does not disclose that GM is transmitting Driving Behavior Data to third parties for commercial purposes or that it is selling such data for millions of dollars.*

58.    The GM Privacy Policy does state under "information about the use of your vehicle, including operational and safety related information", that GM may collect relatively innocuous information such as routing information, driving schedules, speed, braking and swerving/cornering events, and vehicle direction.

59.    However, the section "How we may use your information" fails to disclose such information is being sold to a consumer reporting agency and gives Class Members the distinct impression that such information is being used for internal purposes only, such as improving GM's products quality, safety and security of our "Connected Services."

60.     The GM Privacy Policy specifically states that GM may "de-identify" the data collected "in a way that it can't be reasonably associated with" the driver or the vehicle, when it is shared "with third-parties for any legitimate business purpose"—a provision that is directly counter to the sale of driver specific information to LexisNexis for purposes of adjusting a driver's insurance premium but consistent with the Principles to which GM agreed.

61.     As far as those to whom this driver information would be shared, the GM Connected Services Privacy Statement states:

> **Third-Party Business Relationships**:  With business that GM enters into business relationships, such as SiriusXM, in connection with their products and services; research institutes, for research and development purposes (for example, improving highway safety); or dealers, fleet, or rental car companies, for service or maintenance of your vehicle.  We may also share data with third parties for marketing activities (with necessary consents) or where you have elected to receive a service from them and/or authorized them to request data from GM (for example, financial organizations who offer financing for the purchase or lease of GM vehicles or usage based insurance providers).

62.     In other words, the driver information would only be shared with those with whom GM had a business relationship related to the operation of the vehicle, like Sirius XM, research, dealers and third parties for marketing activities, or where the driver elected to receive a service.

63.     Notably, this provision says nothing about GM's relationship with LexisNexis, with whom it has had a business relationship since 2019 nor would the services LexisNexis or Verisk provide fall into kind of business relationship set out

in the GM Privacy Statement, i.e., one in relation to the products and services they provide to GM.

64.     None of these examples include selling data to consumer reporting agencies and/or data-aggregation companies such as LexisNexis or Verisk. In fact, GM did not disclose that it was providing information to LexisNexis, Verisk or similar companies until late March of this year, when it stated, "As of March 20, 2024, OnStar Smart Driver customer data is no longer being shared with LexisNexis or Verisk."[7]

### *The Mozilla Foundation Discloses the Manufacturers' Scheme*

65.     GM's and other vehicle manufacturers' schemes came to the fore when the Mozilla Foundation published its results of an in-depth investigation, entitled "After Researching Cars and Privacy, Here's What Keeps Us Up At Night". https://foundation.mozilla.org/en/privacynotincluded/articles/after-researching-cars-and-privacy-heres-what-keeps-us-up-at-night/ (the   "Mozilla Article") (Last accessed May 8, 2024).

66.     As the Mozilla Article explained, "[m]odern cars are surveillance-machines on wheels souped-up with sensors, radars, cameras, telematics, and apps that can detect everything we do inside—even where and when we do it." *Id.*

---

[7]   https://www.onstar.com/support/faq/smart-driver (Last accessed May 8, 2024)

67.     The Article explained that vehicles and manufacturing companies were collecting what it termed a "WTF-level" of data, giving rise to numerous privacy red flags, and noting that companies were sharing and selling that information to "service providers, data brokers, the government, and other businesses [that drivers] know little or nothing about." *Id*.

68.     The Article pointed out that despite collecting this private information, vehicle manufacturers lacked sufficient data protection, and that their connectivity was being "weaponized." *Id*.

69.     With regard to telematics or driving behavior, the Article explained that "[t]elematics report your driving behavior directly from your vehicle to your insurance company," and that formerly optional plug-ins allowing for such transmission are rapidly becoming standard features, disabling drivers from being able to opt out of them.

70.     As the Article stated, "[a]ccording to an industry report, most cars sold in 2020 already had telematics built-in.  By 2026, the same report predicts almost all cars (91%) will have 'embedded telematics'." *Id*.

71.     The Article further noted that vehicle manufacturers were off-loading their responsibility to protect driver's privacy to the drivers themselves, placing the onus on the driving public to, for instance, make sure their private information is deleted and to track down the separate privacy policies of the manufacturers and

dealers. *Id*.

### *The Mozilla Article Sparks a Congressional Investigation and Call For FTC Action*

72.     The Mozilla Article unveiled such a disturbing pattern of privacy violations and abuse by manufacturers, including GM, that it sparked a Senate investigation and call by Senator Edward Markey of the Senate Commerce, Science, and Transportation Committee to the FTC to use the full force of its powers to undertake its own investigation of the data privacy practices of auto manufacturers. https://www.markey.senate.gov/news/press-releases/senator-markey-urges-ftc-to-investigate-invasive-data-privacy-practices-of-automakers (Last accessed May 8, 2024).

73.     The Senate investigation commenced about November 30, 2023, with Senator Markey sending letters to thirteen of the major automobile manufacturers, including GM's chief executive officer, Mary Barra, concerning their data privacy practices.https://www.markey.senate.gov/imo/media/doc/senator_markey_letter_to_automakers_on_privacy.pdf (Last accessed May 9, 2024).

74.     These letters asked a number of pointed questions concerning the data these manufacturers collect about drivers and the extent to which they secure that data and transmit it to third parties. In GM's case, this included whether GM collected personal information from any owner and user of its vehicles, and whether it provides the driver with notice and the opportunity to exercise consent to such data

collection. *Id.*

75.    Senator Markey referred to the Mozilla Article's conclusion that automobile manufacturers were engaged in "unfettered data collection", exclaiming that these practices "must end", and explaining:

> These practices are unacceptable. Although certain data collection and sharing practices may have real benefits, consumers should not be subject to a massive data collection apparatus, with any disclosures hidden in pages-long privacy policies filled with legalese. Cars should not — and cannot — become yet another venue where privacy takes a backseat. As more and more cars become computers on wheels, automakers must implement strong privacy policies to protect users.

*Id.* at page 4.

76.    GM responded in December of 2023, but its response was largely evasive and misleading. https://www.markey.senate.gov/imo/media/doc/ automaker_responses_to_sen_markey_letter_on_privacy_-_022824pdf.pdf p. 9 (Last accessed May 8, 2024).

77.    The Response gave lip service to GM's alleged commitment to its customers' privacy, stating that keeping customers in control of their connectivity, maintaining transparency in its data practices, and safeguarding personal information was central to GM's approach.

78.    In response to the question of whether GM collects user data from vehicles, GM misleadingly stated it only collects Driver Behavior Data if a customer opts in and consents to such collection and disclosure.

79.    In response to the question of how GM uses data collected from vehicles, GM provided a fairly benign list of instances, which for the most part, related to the operation of the vehicle, i.e., to respond to safety alerts, or provide functionality for GM in-vehicle applications.

80.    As far as sending such information to insurance companies, the Response stated it was only done with "[w]ith separate consents from owner", and then only by OnStar Insurance to provide offers of auto insurance discounts and to provide insurance quotes for those users who opt into "these limited marking offers."

81.    In response to a question about the sale of driver data and revenue from those sales, GM stated:

> If an owner opts in to Connected Services, GM has the ability to share data collected from [v]ehicles with third parties, as outlined in our US Connected Services Privacy Statement. For example, data might be shared to help emergency responders respond more quickly and accurately, to support in-vehicle services utilized by the owner, and where the owner directs GM to do so (such as helping owners optimize their charging patterns). For those limited data shares where there is a commercial benefit attributable directly to the data sharing, the impact to GM's overall 2022 revenue was de minimis.

82.    The GM Privacy Policy indicates that such information, if shared, is de-identified, and nowhere indicates or suggests that such information is being sold to insurance companies to enable them to raise rates. In fact, the Response suggested just the opposite, that information was only sent upon the driver's consent, to reduce rates or obtain quotes.

83.     GM's response omitted any mention of sale of driver data to consumer reporting agencies such as LexisNexis or Verisk. Further, GM declined to clarify whether it sells driver data to any third parties not listed in GM's Privacy Policy.

84.     On February 27, 2024, Senator Markey, dissatisfied with the evasive and incomplete responses received from the auto manufacturers, urged the FTC to investigate their data privacy practices. Senator Markey noted the large and invasive amounts of data that manufacturers such as GM stockpile, which can be  exploited for a variety of detrimental and even dangerous purposes. https://www.markey.senate.gov/imo/media/doc/senator_markey_letter_to_ftc_on_ auto_privacy__022824pdf.pdf  (Last accessed April 15, 2024).

85.     The Senator noted that "the answers [of the manufacturers] gave me little comfort.  In general, the automakers sidestepped my questions or focused on the beneficial uses of this data—all while ignoring the real privacy risks their data practices created."  He noted that "most automakers refused to disclose whether they transfer data for commercial benefit."

86.     As far as consent, Senator Markey stated that, "[a]lthough all the automakers responded that they provided consumers the opportunity to consent to the collection of their data, just one identified the percentage of consumers that actually provide consent." *Id*.

87.     He further stated that, "[b]ased on public reporting and responses to my

own inquiries into these practices, automakers face few, if any limitations on the collection, use, and disclosure of this data. Consumers are often left in the dark."

***The New York Times Investigation Confirms the Scheme and Elicits GM's Admission***

88.    The Congressional investigation was followed by another devasting article based upon the investigation of the automobile industry by Kashmir Hill ("Hill"), a New York Times reporter. In her article entitled, "Automakers Are Sharing Consumer' Driving Behavior with Insurance Companies" (March 11, 2024), Hill confirmed the rampant privacy violations by the automobile industry generally, and GM, specifically.https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html (Last accessed May 8, 2024).

89.    As Hill explained, in the past, insurance companies offered incentives for drivers to install dongles in their vehicles or to download apps that monitor their driving, but drivers were reluctant to participate in these programs.Consequently, as Hill says, "something much sneakier has happened" with manufacturers offering apps to run various features in the vehicles, that also collect driving behavior information, which they in turn provide to insurance carriers.  This happened even when drivers did not turn on features such as Smart Driver.

90.    Even the risks for those who opt in to Smart Driver are not even clear. As Hill herself a GM car owner noted when she enrolled in the Smart Driver Program, there is no warning or prominent disclosure that any third party would

obtain access to her driving data.

91.    Hill also noted that dealers who are offered incentives to sign customers up for Smart Driver may have been enrolling customers in that program without their knowing consent.

92.    In response to questions from the New York Times, GM admitted that it shares "select insights" about hard braking, hard accelerating, speeding over 80 miles an hour and drive time of Smart Driver with LexisNexis and Verisk.

93.    In late March 2024, given the outrage that followed these investigations, GM announced that it had stopped sharing driver data with LexisNexis and Verisk.

## CLASS ACTION ALLEGATIONS

94.    Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23 on behalf of a Nationwide Class and a Mississippi Subclass defined as:

The Nationwide Class is defined as:

All persons who purchased or leased a vehicle from General Motors and had their Driver Behavior Data transmitted without their knowing consent to unauthorized third-parties, including OnStar, LexisNexis and Verisk.

The Mississippi Subclass is defined as:

All Mississippi residents who purchased or leased a vehicle from General Motors, and had their Driver Behavior Data transmitted without their knowing consent to unauthorized third-parties, including OnStar, LexisNexis and Verisk

95.     Excluded from the Class and Subclass are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any of Defendants' officers or directors, any successors, and any judge who adjudicates this case, including their staff and immediate family.

96.     Plaintiff reserves the right to amend the class and subclass definitions.

97.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

> a.      **Numerosity**. The members of the Class and Subclass are so numerous that joinder would be impracticable. The exact number of class members is unknown to Plaintiff, but may exceed two million, based upon Defendant's total number of customers;
>
> b.      **Ascertainability**. Members of the Class and Subclass are readily identifiable from information in Defendants' possession, custody, and control;
>
> c.      **Typicality**. Plaintiff's claims are typical of class and subclass claims as each arises from the same factual and legal theories.
>
> d.      **Adequacy**. Plaintiff will fairly and adequately protect the proposed Class's and Subclass's interests. Her interests do not conflict with the Class's and Subclass's interests, and she has retained counsel experienced in complex class action litigation and data privacy to

prosecute this action on the Class's behalf, including as lead counsel.

e. **Commonality**. Plaintiff's and the Class's and Subclass's claims raise predominantly common factual and legal questions that a class-wide proceeding can answer for the Class and Subclass. Indeed, it will be necessary to answer the following questions, which include but are not limited to:

    i.    Whether GM vehicles equipped with OnStar software are capable of recording, storing, and transferring class members' driver behavior data;

    ii.    Whether GM and OnStar used such software to record, store, and transfer class members' driver behavior data;

    iii.    Whether GM and OnStar recorded, stored, and transferred class members' driver behavior data without full knowledge and consent;

    iv.    Whether GM and OnStar sold or otherwise supplied Class Members' Driver Behavior Data to third parties not referenced in their privacy statements, including consumer reporting agencies such as LexisNexis and Verisk without the knowledge and consent of class members;

    v.    Whether LexisNexis obtained Class Members' Driver

Behavior Data without the knowledge and consent of class members;

vi.  Whether LexisNexis sold or otherwise supplied Class Members' Driver Behavior Data to third parties without the knowledge and consent of class members;

vii.  Whether Verisk obtained Class Members' Driver Behavior Data without the knowledge and consent of class members;

viii.  Whether Verisk sold or otherwise supplied Class Members' Driver Behavior Data to third parties without the knowledge and consent of class members;

ix.  Whether Defendants' conduct violates the FCRA, the NJCFA, and common law principles; and

x.  The amount and extent of damages to Plaintiff and other class members as a direct and proximate result of Defendants' conduct, and the scope of monetary and injunctive relief as to same.

98.  Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual

lawsuits economically feasible.

**COUNT I**
**Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*.**
**(Against Defendant LexisNexis and Verisk)**

99.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, and asserts this claim against LexisNexis and Verisk.

100.    Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. §1681e(b).

101.    LexisNexis and Verisk, acting as consumer reporting agencies as defined by 15 U.S.C. §1681c(a)(1), have failed to implement procedures to maintain maximum possible accuracy regarding Plaintiff's and the Class Members' Driver Behavior Data.

102.    LexisNexis and Verisk have knowingly and willfully engaged in the collection and production of inaccurate data metrics regarding Plaintiff's and other consumers' driving abilities by taking such information out of context, and failing to provide consumers with the opportunity to review and correct their Driver Behavior Data.

103.    As a result of LexisNexis and Verisk's conduct, insurance carriers and

others who view these consumer reports receive and in turn rely on an inaccurate representation of Plaintiff's and other consumers' driving abilities.

104.   The foregoing deceptive acts and practices constitute willful reckless and/or negligent violations of the FCRA, including but not limited to 15 U.S.C. §1681e(2)(b).

105.   As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. §1681n(a)(1); statutory damages pursuant to 15 U.S.C. §1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. §1681n(a)(2); and reasonable attorney's fees and costs pursuant to 15 U.S.C. §1681n(a)(3) from Defendant.

106.   As a result of each and every willful, reckless, or negligent noncompliance of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. §1681o(a)(1); and reasonable attorney's fees and costs pursuant to 15 U.S.C. §1681o(a)(2) from Defendants.

**COUNT II**
**Violation Of the Mississippi Consumer Protection Act**
**(Miss. Code § 75-24-1 *et seq.*)**
**(Against Defendants GM and OnStar on behalf of the Mississippi Subclass only)**

107.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.   GM and OnStar each provided privacy statements together with the sale of their vehicles and software to Plaintiff and the Class. GM and OnStar intended

that Plaintiff and the Class rely on these privacy statements, having them agree to the terms prior to receiving use of their services and their vehicles. None of the privacy statements disclosed that Plaintiff's and the Class's Driver Behavior Data would be provided to LexisNexis, Verisk, or other data aggregators for resale to other parties including insurance companies, or the extent to which GM and OnStar would profit from that data. GM has admitted that it has earned millions of dollars for the sale of such information.

109.   Each defendant is a "person" as defined by Miss. Code § 75-24-3.

110.   GM and OnStar advertise, offer, and/or sell goods or services in Mississippi and engage in trade or commerce directly or indirectly affecting the people of Mississippi, as defined by Miss. Code § 75-24-3.

111.   Mississippi law expressly prohibits "[a]dvertising goods or services with intent not to sell them as advertised[.]" Miss. Code § 75-24-5(2)(i). GM and OnStar violated this statute by including false information in their privacy statements, which were made available to customers prior to enrollment with the intention that customers rely on this misinformation.

112.   GM and OnStar's misrepresentations and omissions in their privacy statements were material because they were likely to deceive reasonable consumers about the extent to which their Driver Behavior Data would be shared. Plaintiff and the Mississippi Subclass Members would not have consented to share such

information had they known that their information would be sold and dispersed in such a fashion.

113.   GM and OnStar intended to mislead Plaintiff and Mississippi Subclass Members and induce them to rely on their misrepresentations and omissions.

114.   GM and OnStar acted intentionally, knowingly, and maliciously to violate Mississippi law, and recklessly disregarded Plaintiff's and Mississippi Subclass Members' rights.

115.   As a direct and proximate result of GM and OnStar's unconscionable and deceptive practices, Plaintiff and Mississippi Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from increased insurance rates and premiums or the inability to obtain auto insurance in addition to other expenses resulting from disclosure of their Driver Behavior Data.

116.   Plaintiff and Mississippi Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

**COUNT III**
**Violation Of the Mississippi Consumer Protection Act**
**(Miss. Code § 75-24-1 *et seq.*)**
**(Against Defendants LexisNexis and Verisk on**
**behalf of the Mississippi Subclass only)**

117.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.   LexisNexis and Verisk have knowingly and willfully engaged in the collection and production of inaccurate data metrics or Driver Behavior Data regarding Plaintiff's and other consumers' driving abilities by taking such information out of context, and failing to provide consumers with the opportunity to review and correct any inaccurate Driver Behavior Data

119.   As a result of LexisNexis and Verisk's conduct, insurance carriers and others who view these consumer reports receive and, in turn, rely on an inaccurate representation of Plaintiff's and other consumers' driving abilities.

120.   Each defendant is a "person" as defined by Miss. Code § 75-24-3.

121.   LexisNexis and Verisk advertise, offer, and/or sell goods or services in Mississippi and engage in trade or commerce directly or indirectly affecting the people of Mississippi, as defined by Miss. Code § 75-24-3.

122.   Mississippi law expressly prohibits "[R]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another[.]" Miss. Code § 75-24-5(2)(g). Mississippi law further expressly prohibits "[a]dvertising goods or services with intent not to sell them as advertised[.]" Miss. Code § 75-24-5(2)(i).

123.   By providing information in consumer reports that is false and/or

misleading without context, LexisNexis and Verisk fail to provide services that live up to the representations they make to their customers.

124.   LexisNexis and Verisk's misrepresentations and omissions concerning their use of Driver Behavior Data were material because they were likely to deceive reasonable consumers about the extent to which their Driver Behavior Data would be shared. Plaintiff and the Mississippi Subclass Members would not have consented for such information to be shared had they known that their information would be sold and dispersed in such a fashion.

125.   LexisNexis and Verisk's intended to mislead consumers and induce them to rely on their misrepresentations and omissions, thus, injuring Plaintiff and Mississippi Subclass Members

126.   LexisNexis and Verisk acted intentionally, knowingly, and maliciously to violate Mississippi law, and recklessly disregarded Plaintiff's and Mississippi Subclass Members' rights.

127.   As a direct and proximate result of LexisNexis and Verisk's unconscionable and deceptive practices, Plaintiff and Mississippi Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including increased insurance rates and premiums or the inability to obtain auto insurance in addition to other expenses resulting from disclosure of their Driver Behavior Data.

128.   Plaintiff and Mississippi Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

**COUNT IV**
**Unjust Enrichment**
**(Against Defendants GM and OnStar)**

129.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.   Plaintiff and members of the Class conferred a benefit upon GM and OnStar in purchasing their vehicles and software. GM and Onstar are in privity with Plaintiff and the proposed Class.

131.   GM and OnStar appreciated or had knowledge of the benefits conferred upon them by Plaintiff and the Class. Defendants also benefited from the receipt of Plaintiff's and the Class's Driver Behavior Data, without revealing the extent to which they would disclose and sell that data or benefit from same, to the detriment of Plaintiff and the Class. Defendants thus unjustly enriched themselves at the expense of Plaintiff and the Class by selling their Driver Behavior Data without their knowledge and consent.

132.   Under principles of equity and good conscience, GM and OnStar should not be permitted to retain the full value unjustly obtained from Plaintiff's and the

Class's Driver Behavior Data. Plaintiff and the proposed Class would not have

willingly provided such data to Defendants had they known the extent to which their

data would be disclosed.

133.   GM and OnStar should be compelled to disgorge into a common fund

for the benefit of Plaintiff and members of the Class all unlawful or inequitable

proceeds received by them because of their misconduct.

**COUNT V**
**Breach of Contract**
**(Against Defendants GM and OnStar)**

134.   Plaintiff incorporates by reference and realleges each and every

allegation contained above, as though fully set forth herein.

135.   The GM Privacy Policy (General Motors U.S. Connected Services

Privacy Statement), is a valid contract between GM and Class Members, purchasers

and users of GM vehicles, to which both parties agreed and in which both parties

entered when a Class Member purchased a GM vehicle or used a GM vehicle and

GM's connected services.

136.   Class Members' accepted the terms of the contract when they

purchased a GM vehicle or used a GM vehicle and contracted for the connected

services, and provided consideration to GM through the purchase or use of the

vehicle by which GM obtained this consideration.

137.   There was a meeting of the minds as to the terms of the contract, as

further set for the below, which did not allow or reasonably contemplate GM's sale of the Driver Behavior Data to a third party for use by that third party for determination of insurance premiums, or any other service unrelated to the operation of the vehicle.

138.    The GM Privacy Policy specifically states that when a purchaser or user of a GM vehicle interacts with GM through its Connected Services, or through one of its apps, it may collect driving and performance information.  It further states that such driving and performance data will only be shared "within GM, with automotive dealers, licensees, and companies with whom [GM enters] into business relationships, in order to develop, enhance, provide, service, maintain, and improve the safety, security, and quality of [GM's] products, programs, and services."

139.    It states that GM will collect, among other information, route history, driving schedule, speed, braking and swerving/cornering events, and vehicle direction, and sets forth under the section "How We may Use Your Information", a list of instances in which this information will be used.  Nothing in that list indicates that this information will be sold to third parties for their use in determining and increasing insurance rates or any other service unrelated to the operation of a user's vehicle or to the enhancement of GM's products, programs and services.

140.    The GM Privacy Policy further states that GM may "de-identify" this information to "share it with third parties for any legitimate business purpose", and

that such businesses would only be those with which GM maintains a business relationship, in connection with their products and services, using as an example Sirius XM, an entity that provides services and products to GM vehicle owners.

141.   GM has violated and breached the terms of the GM Privacy Policy by selling identifiable, driver specific Driver Behavior Data to third parties for purposes unrelated to the services and products provided to the vehicle owner.

142.   The sale of the Driver Behavior Data was not related to developing, enhancing, providing, servicing, maintaining, and improving the safety, security, and quality of GM's products, programs, and services.

143.   By selling the Driver Behavior Data to a third party who had a relationship with GM but who was not engaged in providing, servicing, maintaining, and improving the safety, security, and quality of GM's products, programs, and services, GM has breached its obligations under the GM Privacy Policy, or the contract, and did not fulfill the terms of the GM Privacy Policy.

144.   Plaintiff and Class Members have been damaged by GM's breach of its obligations under the GM Privacy Policy by: (1) causing Plaintiff and Class Members to pay higher insurance premiums for vehicle insurance; (2) preventing some Class Members from obtaining reasonably priced or any vehicle insurance; (3) causing Plaintiff and Class Members the loss and diminution of the value of their personal, identifiable Driver Behavior Data which has a value as GM was able to

sell such information for millions of dollars, and (4) causing Plaintiff and Class Members to overpay for their GM vehicle and OnStar or Connectivity services which failed to provide them with the promised security of their Driver Behavior Data.

145.   As a result of GM's and OnStar's breach of contract, Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

### COUNT VI
### CLAIM FOR DECLARATORY & INJUCTIVE RELIEF

146.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.   Under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this complaint.

148.   Defendants GM and OnStar owe duties of care to their customers, including Plaintiff and Class Members.

149.   Defendants LexisNexis and Verisk owe duties under the FCRA to provide correct and factual information in consumer reports.

150.   Defendants continue to sell or otherwise provide false and contextually misleading Driver Behavior Data, in violation of their respective legal duties, thereby

continuing to damage Plaintiff and Class Members as described above.

151.   Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, that Defendants' sale of false and contextually misleading Driver Behavior Data violates their legal duties.

152.   The Court should also issue corresponding prospective injunctive relief requiring Defendants to cease selling or otherwise providing false and contextually misleading Driver Behavior Data and to remove all such information from Defendants' servers.

153.   If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and will lack an adequate legal remedy. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. The costs of complying with the injunction would be relatively minimal for Defendants in comparison with the costs to Plaintiff and Class Members of paying higher insurance rates and premiums that they cannot afford.

154.   Issuance of the requested injunction would not disserve the public interest. To the contrary, such an injunction would benefit the public by calming public concern about the privacy of Driver Behavior Data and by slowing the increase in auto insurance rates and premiums that result from auto insurance carriers receiving false and misleading information about customers and prospective customers.

## **<u>PRAYER FOR RELIEF</u>**

Plaintiff and the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.   Certifying this case as a class action on behalf of Plaintiff and the proposed Class and Subclass, appointing Plaintiff as class and subclass representative, and appointing her counsel to represent the Class;

B.   Awarding declaratory, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

C.   Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D.   Enjoining Defendants from further violations of statutes and common law that would further damage Plaintiff and the Class;

E.   Awarding Plaintiff and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.   Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.   Awarding attorneys' fees and costs, as allowed by law;

H.   Awarding prejudgment and post-judgment interest, as provided by law;

I.     Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.     Granting such other or further relief as may be appropriate under the circumstances.

Respectfully submitted, this 10th day of May, 2024.

> */s/ Roy E. Barnes*
> Roy E. Barnes
> Ga. Bar No. 039000
> John R. Bevis
> Georgia Bar No. 056110
> J. Cameron Tribble
> Georgia Bar No. 754759
> **BARNES LAW GROUP, LLC**
> 31 Atlanta Street
> Marietta, GA 30060
> Telephone: (770) 227-6375
> roy@barneslawgroup.com
> bevis@barneslawgroup.com
> ctribble@barneslawgroup.com
>
> */s/ Howard T. Longman**
> **LONGMAN LAW, P.C.**
> 354 Eisenhower Parkway, Suite 1800
> Livingston, New Jersey 07039
> Telephone: (973) 994-2315
> hlongman@longman.law
>
> */s/ Gary S. Graifman*
> Gary S. Graifman*
> Andre J. Arias*
> **KANTROWITZ GOLDHAMER &**
> **GRAIFMAN, P.C.**
> 135  Chestnut Ridge Rd., Suite 200
> Montvale, NJ 07645

Telephone:  (201) 391-7000
ggraifman@kgglaw.com
aarias@kgglaw.com

*/s/ Lynda J Grant**
**THE GRANT LAW FIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
LGrant@grantfirm.com

*Applications for Pro Hac Vice
Forthcoming

*Attorneys for Plaintiff & the Proposed
Class and Subclass*